# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| **SHAWN SOUTHERLAND,** | Civil Action No. 18-9469 (JLL) |
| Petitioner, | |
| v. | OPINION |
| **PATRICK N. NOGAN,** *et al.*, | |
| Respondents. | |

**LINARES**, Chief District Judge:

Presently before the Court is the petition for a writ of habeas corpus of Shawn Southerland ("Petitioner") brought pursuant to 28 U.S.C. § 2254 challenging his state court murder conviction. (ECF No. 1). Respondents filed a response to the petition, (ECF No. 30), to which Petitioner replied. (ECF No. 33). Petitioner has also filed a request for an evidentiary hearing, as well as a second motion for partial summary judgment. (ECF Nos. 34, 36). For the following reasons, the Court will deny the petition, as well as Petitioner's request for an evidentiary hearing and second motion for partial summary judgment. Petitioner is also denied a certificate of appealability.

## I. BACKGROUND

Petitioner was indicted on three counts in Hudson County for first-degree murder in violation of N.J.S.A. 2C:11-3(a)(1) or (2), third-degree hindering apprehension or prosecution by way of concealment or destruction in violation of N.J.S.A. 2C:11-3(a)(1), and third-degree hindering apprehension or prosecution by giving false information to a law enforcement officer in violation of N.J.S.A. 2C:29-3(b)(4). (ECF No. 1 at 40). At his trial, petitioner waived his right to an attorney and decided to represent himself. (ECF No. 1 at 40). The trial court appointed

1

Petitioner's public defender as standby counsel and thereafter denied Petitioner's motions to appoint new standby counsel. (ECF No. 1 at 40).

Over the course of pre-trial proceedings, Petitioner filed several motions to suppress evidence, which the trial court denied. (ECF No. 1 at 40). The trial court also denied Petitioner's motions to dismiss the indictment. (ECF No. 1 at 40). However, on November 10, 2011, Petitioner filed a motion to dismiss the third count of the indictment, which the trial court granted. (ECF No. 1 at 40). Then, the trial court granted Petitioner's motion to waive his right to a jury trial. (ECF No. 1 at 40).

Judge Francis B. Schultz oversaw the nine-day bench trial. (ECF No. 1 at 40). On February 1, 2012, the judge issued a "comprehensive oral decision finding" Petitioner guilty on counts one and two. (ECF No. 1 at 41). Judge Schultz then denied Petitioner's motion for acquittal and a new trial and sentenced Petitioner to thirty years in prison on count one on March 16, 2012. (ECF No. 1 at 41). Petitioner's sentence included a thirty-year period of parole ineligibility on count one and a concurrent five-year sentence on count two. (ECF No. 1 at 41). Judge Shultz also ordered that Petitioner serve a five-year term of parole supervision upon his release. (ECF No. 1 at 41).

At trial, the State established the following. The victim lived in Bayonne with her fourteen-year old son. (ECF No. 1 at 44). Petitioner and the victim met while they were in law school together in 2002. (ECF No. 1 at 44). Petitioner then moved into the victim's apartment in December 2005. (ECF No. 1 at 44). The victim's son described a tumultuous relationship between Petitioner and the victim, in which they fought "every day." (ECF No. 1 at 44). Petitioner moved to Texas in January 2007, but subsequently returned to the apartment in March 2007. (ECF No. 1 at 44).

The victim usually woke her son up for school, but on the morning of April 4, 2007, she did not. (ECF No. 1 at 44). Instead, her son got himself dressed and went to the bedroom to say goodbye to his mother. (ECF No. 1 at 44). The victim's son testified that the door was closed and Petitioner stepped in front of the door to keep him from going inside the bedroom. (ECF No. 1 at 44). The victim's son then left the apartment. (ECF No. 1 at 44–45). He stated that he did not hear any sounds come from the bedroom that morning or hear anything unusual the night before. (ECF No. 1 at 45). The victim's son usually stayed up in his room playing videogames and watching TV. (ECF No. 1 at 45).

The victim's son returned home from school around 4:00 p.m. (ECF No. 1 at 45). Petitioner was in the apartment, but the victim was not. (ECF No. 1 at 45). When the victim's son asked Petitioner about his mother, Petitioner told the son that he had not seen her. (ECF No. 1 at 45). The son saw that a white blanket and some of his mother's "personal accessories" were missing from her bedroom. (ECF No. 1 at 45).

The victim's son testified that Petitioner gave him money to buy food at a take-out restaurant and then followed him there on a bicycle. (ECF No. 1 at 45). They returned to the victim's apartment, at which point Petitioner told the victim's son that he had to go see his sick aunt in the hospital. (ECF No. 1 at 45). When he left, Petitioner took all his belongings with him. (ECF No. 1 at 45). The victim's son testified that Petitioner would borrow a silver Kia from someone he called "his aunt," but that after Petitioner left that night he never saw Petitioner or the car again. (ECF No. 1 at 45).

As for the Kia, Petitioner's friend testified that Petitioner borrowed her 2001 Kia on April 3, 2007 and returned it early in the evening on April 5, 2007 with two flat tires. (ECF No. 1 at

3

45). Petitioner then stayed at his friend's home until April 9, 2007, when she drove him to a train station. (ECF No. 1 at 46).

The victim's son informed his school that his mother had disappeared, and two or three days later he went to his grandmother's house in New York City, where he informed her that his mother was missing. (ECF No. 1 at 46).

On the morning of April 7, 2007, a New York City Department of Transportation employee found a black duffel bag along the Henry Hudson Parkway in New York, roughly twenty-five miles from Bayonne. (ECF No. 1 at 46). Inside the bag was the body of a woman. (ECF No. 1 at 46). The employee who found the bag testified that he had not seen the bag when he cleaned that area the day before. (ECF No. 1 at 46). New York City police officers picked the body up and began their investigation. (ECF No. 1 at 46).

The New York City medical examiner performed an autopsy on the body on April 8, 2007. (ECF No. 1 at 46). The medical examiner testified that the police found the body in a large, expandable, black bag with the brand name "G&S" on it. (ECF No. 1 at 46). The body was fully clothed and wrapped in a "white bed sheet" and black plastic. (ECF No. 1 at 46). There were also two rings and a bracelet on the body. (ECF No. 1 at 46).

The autopsy revealed "multiple blunt-impact injuries on the body, including abrasions and contusions of the neck, torso, and extremities." (ECF No. 1 at 46). The medical examiner believed that the cause of death was homicide by "compression of the neck," and placed the date of death on or before April 4, 2007. (ECF No. 1 at 46–47).

A friend of the victim testified that she recognized the victim's jewelry when she saw it on a television report on April 9 about a "woman found on the Henry Hudson." (ECF No. 1 at 47). The friend then contacted the victim's family. (ECF No. 1 at 47). After 5:00 p.m. on April 9,

Bayonne Police Officer Ponik went to the victim's apartment as part of his investigation arising out of a missing persons report. (ECF No. 1 at 47). Officer Ponik met with the victim's son, as well as her parents, brother, and various other family and friends. (ECF No. 1 at 47). The officer was at the apartment for about six hours, collecting information from the group there. (ECF No. 1 at 47). Officer Ponik also contacted other agencies for information, including the Division of Youth and Family Services regarding custody of the victim's son. (ECF No. 1 at 47).

While Officer Ponik was at the apartment, the victim's brother tried calling the victim's cell phone several times. (ECF No. 1 at 47). Around 11:00 p.m., roughly five minutes after the brother's last call attempt, Petitioner called the brother back. (ECF No. 1 at 47). Officer Ponik asked the victim's brother to place the call on speakerphone, and the brother obliged. (ECF No. 47–48). Petitioner initially denied knowing where the victim was. (ECF No. 1 at 48). He later admitted seeing her on April 2, 2007. (ECF No. 1 at 48). "Then, 'out of nowhere,'" petitioner told the victim's brother that the victim "went on vacation," for which he bought her a "black folding type suitcase." (ECF No. 1 at 48). Petitioner told the victim's brother he was in Rockland County, New York visiting a sick aunt. (ECF No. 1 at 48). He did not give the victim's brother any contact information and then hung up. (ECF No. 1 at 48).

Petitioner called the victim's brother back five or ten minutes later. (ECF No. 1 at 48). He mentioned he would return to Bayonne the next day and admitted he had the victim's cell phone. (ECF No. 1 at 48). The victim's brother asked Petitioner to help the family locate the victim, but Petitioner was uncooperative and hung up. (ECF No. 1 at 48). The next day, Petitioner did not go to Bayonne as he had claimed he would. (ECF No. 1 at 48).

On April 10, 2007, the New York City police department sent a sketch of the woman found in the black bag on the Henry Hudson parkway, along with photographs of her clothing and

5

jewelry, to the Bayonne police department. (ECF No. 1 at 48). The Bayonne police recognized the items in the photograph as the victim's and later that day, the victim's father identified the body at the medical examiner's office. (ECF No. 1 at 48). That day, the police also obtained and executed a search warrant for the victim's apartment but did not find anything of evidentiary value. (ECF No. 1 at 48).

Also on April 10, Bayonne detectives sought out a store that sold bags similar to the one in which the victim's body was found. (ECF No. 1 at 49). They found a store seven blocks from the victim's apartment that sold the same G&S collapsible bags. (ECF No. 1 at 49). The store's owner told the police that she had ordered five of these bags and sold one. (ECF No. 1 at 49). The detectives bought one of the bags and "took it back to headquarters." (ECF No. 1 at 49).

On April 11, the detectives went back to the store to interview the owner. (ECF No. 1 at 49). The owner told the detectives that on April 4, a man entered the store. (ECF No. 1 at 49). One of the sales associates approached the man and brought him to the cash register. (ECF No. 1 at 49). The owner stated that she dealt with the man "face to face" at the register, and that the lighting in the store was good. (ECF No. 1 at 49). The man then purchased a black, hard-sided G&S suitcase, which he told the owner was for a cruise he and his wife were going on in the Bahamas. (ECF No. 1 at 49). He paid for the bag in cash. (ECF No. 1 at 49).

An hour later, the man returned to the store with the black hard-sided bag and asked for a refund. (ECF No. 1 at 49). The store allowed him to return the bag and he then purchased a "metal fold-up luggage carrier[]." (ECF No. 1 at 49). The man then came back to the store a third time and asked the owner about a black, expandable G&S suitcase. (ECF No. 1 at 49). The owner told the man that the bag was "totally flexible and expandable. It can move. It's not solid. It's not rigid." (ECF No. 1 at 49). The man paid for the expandable G&S suitcase with cash. (ECF No.

1 at 49–50). The detectives then brought the first bag the man purchased back with them to headquarters. (ECF No. 1 at 50).

The detectives asked the store owner to come back to the police station, where she identified Petitioner as the man who purchased the suitcases. (ECF No. 1 at 50–51). She later identified Petitioner at trial as well. (ECF No. 1 at 51). The State also put a DNA expert on the stand at trial, who testified that the victim's DNA was found on the "top inner rim of the first bag [Petitioner] purchased from, and then returned to, the Bayonne store." (ECF No. 1 at 51). The DNA expert did not test the inside of the bag in which the victim's body was found and did not find the victim's DNA on the outside of that bag. (ECF No. 1 at 51).

Then, on October 14, 2008, a golfer called the New York City Police department to tell them he recognized a caddy working at a golf club in Whitemarsh Township, Pennsylvania as someone wanted by the NYPD for questioning in a homicide case. (ECF No. 1 at 51). The NYPD sent a flyer with Petitioner's name and photo to a detective at the Whitemarsh Township police department. (ECF No. 1 at 51).

That detective then emailed the flyer to golf club's manager. (ECF No. 1 at 51). The manager told the detective that the photo resembled one of the caddies there, but that the caddy's name was Keith Davis, not Shawn Southerland. (ECF No. 1 at 51). The Whitemarsh detective went to the club to interview Keith Davis. (ECF No. 1 at 51). Keith Davis denied having any identification and told the detective that his wallet was empty. (ECF No. 1 at 51–52). The detective asked Keith Davis to take his wallet out and show him. (ECF No. 1 at 52). When he did so, the detective observed a Texas ID with the name Shawn Southerland on it. (ECF No. 1 at 52). The detective stated that, "[a]t this point, [Petitioner] says to me, 'I knew this day was coming.'"

7

(ECF No. 1 at 52). The detective also said that Petitioner told him that he had left New York and that this was his new identity. (ECF No. 1 at 52).

At the end of the trial, Judge Schultz issued an oral opinion, which the Appellate Division deemed "thorough." (ECF No. 1 at 52). Judge Schultz found beyond a reasonable doubt that Petitioner purposely caused the death of the victim and concealed the evidence by putting the body in the black bag and dumping it on the highway with the purpose of hindering his apprehension, prosecution, and conviction. (ECF No. 1 at 52).

## II. DISCUSSION

### A. Legal Standard

Under 28 U.S.C. § 2254(a), the district court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." The petitioner has the burden of establishing his entitlement to relief for each claim presented in his petition based upon the record that was before the state court. *See Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013); *see also Parker v. Matthews*, 567 U.S. 37, 40–41 (2012). Under the statute, as amended by the Anti-Terrorism and Effective Death Penalty Act, 28 U.S.C. § 2244 ("AEDPA"), district courts are required to give great deference to the determinations of the state trial and appellate courts. *See Renico v. Lett*, 559 U.S. 766, 772-73 (2010).

Where a claim has been adjudicated on the merits by the state courts, the district court shall not grant an application for a writ of habeas corpus unless the state court adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). Federal law is clearly established for the purposes of the statute where it is clearly expressed in "only the holdings, as opposed to the dicta" of the opinions of the United States Supreme Court. *See Woods v. Donald*, --- U.S. ---, ---, 135 S. Ct. 1372, 1376 (2015). "When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Id.* Where a petitioner challenges an allegedly erroneous factual determination of the state courts, "a determination of a factual issue made by a State court shall be presumed to be correct [and t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

**B. Analysis**

In his petition Petitioner raises two claims of ineffective assistance of counsel and requests that the Court grant him an evidentiary hearing on those claims. The standard applicable to ineffective assistance of counsel claims is well established:

> Claims of ineffective assistance are governed by the two-prong test set forth in the Supreme Court's opinion in *Strickland v. Washington*, 466 U.S. 668, (1984). To make out such a claim under *Strickland*, a petitioner must first show that "counsel's performance was deficient. This requires [the petitioner to show] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687; *see also United States v. Shedrick*, 493 F.3d 292, 299 (3d Cir. 2007). To succeed on an ineffective assistance claim, a petitioner must also show that counsel's allegedly deficient performance prejudiced his defense such that the petitioner was "deprive[d] of a fair trial . . . whose result is reliable." *Strickland*, 466 U.S. at 687; *Shedrick*, 493 F.3d at 299.
>
> In evaluating whether counsel was deficient, the "proper standard for attorney performance is that of 'reasonably effective

> assistance.'" *Jacobs v. Horn*, 395 F.3d 92, 102 (3d Cir. 2005). A petitioner asserting ineffective assistance must therefore show that counsel's representation "fell below an objective standard of reasonableness" under the circumstances. *Id.* The reasonableness of counsel's representation must be determined based on the particular facts of a petitioner's case, viewed as of the time of the challenged conduct of counsel. *Id.* In scrutinizing counsel's performance, courts "must be highly deferential . . . a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.
>
> Even where a petitioner is able to show that counsel's representation was deficient, he must still affirmatively demonstrate that counsel's deficient performance prejudiced the petitioner's defense. *Id.* at 692–93. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. The petitioner must demonstrate that "there is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *see also Shedrick*, 493 F.3d at 299. Where a "petition contains no factual matter regarding *Strickland's* prejudice prong, and [only provides] . . . unadorned legal conclusion[s] . . . without supporting factual allegations," that petition is insufficient to warrant an evidentiary hearing, and the petitioner has not shown his entitlement to habeas relief. *See Palmer v. Hendricks*, 592 F.3d 386, 395 (3d Cir. 2010). "Because failure to satisfy either prong defeats an ineffective assistance claim, and because it is preferable to avoid passing judgment on counsel's performance when possible, [*Strickland*, 466 U.S. at 697–98]," courts should address the prejudice prong first where it is dispositive of a petitioner's claims. *United States v. Cross*, 308 F.3d 308, 315 (3d Cir. 2002).

*Judge v. United States*, 119 F. Supp. 3d 270, 280–81.

*1. Ineffective Assistance of Appellate Counsel*

In his first claim, Petitioner argues that his appellate counsel proved constitutionally ineffective when he failed to challenge the trial court's decision to admit into evidence the telephone conversation between Petitioner and the victim's brother that was played on speakerphone while Officer Ponik was in the room. (ECF No. 5 at 27–36). Petitioner also argues

that his appellate counsel should have challenged any evidence that Officer Ponik collected as a result of that phone call as fruit of the poisonous tree. (ECF No. 5 at 27–28). Petitioner asserts that Officer Ponik intercepted that phone call without his permission, and that he believes there was insufficient testimony at a pretrial hearing as to whether the victim's brother consented to have the officer listen to the call. (ECF No. 5 at 27–28).

The actions of appellate counsel are subject to the same ineffective assistance standard applicable to trial counsel. *See Smith v. Robbins*, 528 U.S. 259, 285 (2000). "[I]t is a well established principle that counsel decides which issues to pursue on appeal," *Sistrunk v. Vaughn*, 96 F.3d 666, 670 (3d Cir. 1996), and appellate counsel need not raise every possible claim a defendant might want to pursue, *Jones v. Barnes*, 463 U.S. 745, 751 (1983). Because the chief component of effective appellate advocacy is the winnowing out of weaker claims in favor of those with a greater chance of success, *id.* at 751–52, the Supreme Court has held that "[g]enerally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome," *Robbins*, 528 U.S. at 288 (quoting *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986)). As such, counsel cannot be constitutionally ineffective when he fails or refuses to raise a claim which is meritless. *Werts v. Vaughn*, 228 F.3d 178, 203 (3d Cir. 2000).

This Court need not guess what would have happened had Petitioner's appellate counsel raised a Fourth Amendment claim because Petitioner himself raised the claim in a *pro se* submission, which the Appellate Division rejected on the merits. (ECF No. 1 at 59–62). As the Appellate Division noted, the victim's brother consented to Officer Ponik listening in on the call when he placed the call on speakerphone at the officer's request. (ECF No. 1 at 59). Both the New Jersey wiretap statute and the Fourth Amendment require that only one party to a telephone call consent to its being overheard without a warrant by police. (*See* ECF No. 1 at 59–62). Thus,

had counsel raised that same claim, it would have proven no more successful than it did when Petitioner raised the claim, and Petitioner cannot show he was prejudiced by counsel's failure to raise it.

This Court has also explained to Petitioner that this argument fails on the merits in denying his motion for summary judgment. (ECF No. 25 at 4). As mentioned above, both the United States Constitution and New Jersey's Wiretap Act require only the consent of one party to a conversation to permit the police to lawfully listen to or otherwise record a telephone conversation. *See, e.g., Fitzgerald v. D'Ilio*, No. 14-4025, 2018 WL 2095596, at *19 (D.N.J. May 4, 2018) ("one-party consent [is] sufficient to validate the recording [of a conversation] under State and federal law"). Petitioner's contention that the victim's brother did not testify at the suppression hearing on this issue prior to trial and that no finding of consent can therefore be made overlooks the state courts' factual findings and the law: because the victim's brother willingly placed the call with Petitioner on speakerphone at the officer's request, those actions alone are sufficient to show his consent to the officer's listening in on the phone call. *Fitzgerald*, 2018 WL 2095596 at *19. The trial court's factual findings must be presumed correct by this Court, 28 U.S.C. § 2254(e)(1), and Petitioner has failed to prove by clear and convincing evidence that the trial court's finding was erroneous.[1] Petitioner's underlying claim would not have succeed had appellate counsel raised it, and thus appellate counsel cannot have been ineffective in failing to do so. *Werts*, 228 F.3d at 203. Petitioner's ineffective assistance of appellate counsel claim is denied.

---

[1] Petitioner also argues that the victim's brother could not have had authority to put the call on speakerphone while Officer Ponik was in the room, as the brother did not have authority to consent while in the apartment Petitioner formerly shared with the victim. (ECF No. 5 at 29). Petitioner cites to *State v. Suazo*, 133 N.J. 315, 320 (1993) and *United States v. Matlock*, 415 U.S. 164, 171, 177 n.7 (1974), both of which require a consenting third party to a search of physical property to have "common authority over or other sufficient relationship" to the property being inspected. These cases are inapplicable to Petitioner's situation, as he does not assert that any physical evidence was improperly seized from the apartment.

### 2. *Ineffective Assistance of Plea Counsel*

In his second claim, Petitioner asserts that his plea counsel was ineffective in advising him as to the evidence that would be presented at trial, and that he rejected a plea offer he otherwise would have taken had he been properly advised. (ECF No. 5 at 37). Petitioner's right to effective assistance of counsel extends to the plea-bargaining process. *United States v. Bui*, 795 F.3d 363, 367 (3d Cir. 2015) (citing *Lafler v. Cooper*, 566 U.S. 156, 162 (2012)). This right requires counsel to provide a defendant with "enough information 'to make a reasonably informed decision whether to accept a plea offer." *Id.* (quoting *Shotts v. Wetzel*, 724 F.3d 364, 376 (3d Cir. 2013)). Plea counsel's failure to adequately advise a petitioner in relation to a plea offer can therefore serve as a basis for a claim of ineffective assistance of counsel. Where a petitioner can show that counsel's plea-related advice was deficient, he must still establish prejudice by showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different . . . [, which i]n the context of pleas [requires] a [petitioner to] show the outcome of the plea process would have been different with competent advice." *Lafler*, 566 U.S. at 163. To establish prejudice, Petitioner must therefore show that a plea was offered, that he would have accepted the plea absent counsel's deficient advice, that the deal would not have been withdrawn, that the trial judge would have accepted the plea, and that he would have received a lesser sentence or conviction under the plea. *Id.* at 164. Where "no plea offer is made," however, the "issue . . . simply does not arise" as criminal defendants have no federal right to be offered a plea, nor a right to any specific type of plea. *Id.* at 168; *see also Missouri v. Frye*, 566 U.S. 134, 148 (2012).

Petitioner first argues that his plea counsel[2] misadvised him as to the evidence the state would be able to present regarding the time and location of the death of the victim, and that this advice led to reject a plea offer in which he would have pled guilty to manslaughter and related charges in return for a ten-year sentence. (ECF No. 5 at 37–38). Petitioner specifically contends that counsel conveyed to him in a letter and reiterated that the testimony of the medical examiner would not be able to establish that the victim's death occurred on the date charged and thus the State could not prove when or where the victim's death took place. (ECF No. 5 at 38). Petitioner's argument, however, is based on a selective reading of the letter that counsel sent him. The letter in general advised Petitioner as to the elements of his case that might help or hinder an alibi defense, but it also provided the following advice regarding the potential time of death of the victim:

> I find it very difficult to imagine how you will be able to assert a credible and successful alibi defense given the factual context presented in the States discovery. The biggest obstacle to a successful alibi defense is the fact that it is not absolutely clear when the crime occurred, since there is no direct evidence relating to the date or time of [the victim's] death, thus making it difficult to assert a time-specific alibi. The best circumstantial evidence indicates that [the victim] was killed in her residence sometime between the late evening hours of April 2, 2007 and approximately 8:00 AM on April 3, 2007, at a time when it is anticipated the victim's son will testify you were not only present but prevented him from entering his mother's bedroom before he went to school that morning. The only direct piece of evidence relating to [the victim's] death was that she was certainly dead when her body was discovered inside a duffel bag along the Henry Hudson Parkway on April 7, 2007 at approximately 8:45 AM. In this regard the Medical Examiner from the Bronx is anticipated to estimate that at the time of her initial observation of [the victim] on April 7, 2007 at 2:00 PM, [the victim] had been dead for at least 24 to 36 hours, which would put her

---

[2] As mentioned in the background section of this Opinion, Petitioner moved for and was granted permission to proceed *pro se* and the counsel at issue here was therefore generally acting as standby counsel. Counsel was, however, apparently party to and advising Petitioner in relation to plea negotiations, and was apparently negotiating on Petitioner's behalf for at least part of the plea discussions between Petitioner and the State. This Court thus refers to counsel as "plea counsel" in this opinion.

> estimated time of death somewhere between 2:00 AM on April 6, 2007 and 2:00 PM on April 6, 20[07]. It is of course, possible and indeed probable that [the victim] somehow died at an earlier point in time, a point I doubt the Medical, Examiner would seriously dispute, especially if asked by the prosecutor.
>
> Unfortunately for you, there are several additional witnesses who will place you in the local New York area in different places at different times for different reasons during that period. The point is you were in the New York area and not in Australia or some other distant locale during the crucial period from April 2 thru April 6, 20[07]. In the absence of a definite time of death, it will be difficult, if not impossible to account for a specific period of time with an alibi that a jury will find convincing. A patchwork series of alibis is doomed to failure; you [would] really need an all encompassing alibi or two covering the whole week, and it does not appear that you have it, unless you are prepared to call everyone from the victim's son to your own aunt a liar.

(ECF No. 5-3 at 44–45).

Read in full, this letter does not advise Petitioner that he was unlikely to be convicted based the medical examiner's uncertainty surrounding the actual time of the victim's death. The letter explains that the medical examiner could say only that the victim had been dead at least twenty-four to thirty-six hours, and that the medical examiner would likely testify that the victim's death could have occurred considerably earlier. That is, in fact, what the medical examiner ended up stating in her testimony. (ECF No. 1 at 63, 84). Counsel also explained that the testimony of the victim's son and others would suggest that the victim had died considerably sooner—between April 2 and April 3, 2007—a time when Petitioner and the victim were in the victim's apartment with her son. It appears then that plea counsel's letter explained the danger Petitioner was facing and specifically advised him that the evidence suggested that Petitioner had killed the victim on the evening when he was in or near the victim's apartment. The letter thus shows that plea counsel gave Petitioner "enough information 'to make a reasonably informed decision whether to accept a plea offer." *Bui*, 795 F.3d at 367 (quoting *Shotts*, 724 F.3d at 376).

In his second argument, Petitioner argues that plea counsel failed to inform him that *nolo contendere* pleas are unavailable in New Jersey, and that he should instead have sought a conditional plea instead. (ECF No. 5 at 29). However, Petitioner has not provided the Court with an indication that he was offered a conditional plea. The evidence in the record indicates that the pleas that Petitioner was offered would have required him to plead guilty to manslaughter and hindering apprehension in exchange for a sentence of either ten or fifteen years on the manslaughter charge. (ECF No. 5-3 at 51). As Petitioner has neither alleged nor shown that he was offered a conditional guilty plea deal, and as he has no right to be offered a conditional guilty plea, he cannot show prejudice and thus cannot establish that counsel was ineffective in failing to advise him that a *nolo contendere* plea was not available and that he should have instead sought a conditional guilty plea. *Lafler*, 566 U.S. at 168.

Petitioner's plea-related arguments face two additional hurtles. First, the Court notes that, while representing himself in a plea cutoff hearing, Petitioner repeatedly and unequivocally stated that he fully understood the offered deal and "reject[ed] the offer, period," after the proposed deals were explained to him by the trial court and prosecutor in detail. (ECF No. 5-3 at 54–56). Petitioner's "[s]olemn declarations in open court carry a strong presumption of verity." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977). "The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible." *Id.* Petitioner rejected the State's plea nearly nine months after he wrote a letter indicating he was open to negotiations. (ECF No. 30-24 at 36–37; ECF No. 5-3 at 53). Thus, contrary to Petitioner's assertion that he could—and would—have taken a conditional plea, the record indicates that he was not offered a conditional plea and rejected the offered pleas after affirming he fully understood them while acting as his own counsel.

Petitioner's second hurdle is that in choosing to proceed *pro se*, Petitioner was warned that he would be unable to raise claims of ineffective assistance of counsel, and specifically stated that he understood he was waiving his right to raise such a claim on appeal or collateral attack as to pre-trial and trial proceedings. (*E.g.,* ECF No. 1 at 104). Petitioner has no right to standby counsel, *United States v. Tilley*, 326 F. App'x 96, 96–97 (3d Cir. 2009) (citing *McKaskle v. Wiggins*, 465 U.S. 158, 178 (1984)), and Petitioner knowingly and voluntarily waived any and all claims of ineffective assistance of counsel when he chose to proceed *pro se*. *See Faretta v. California*, 422 U.S. 806, 834 n.46 (1975) ("[A] defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to denial of 'effective assistance of counsel.'"). Petitioner is not entitled to relief based on his standby counsel's advice and contributions during the plea process, particularly considering that the record indicates that Petitioner conducted his own negotiations with the State, at least in parallel with any conducted by counsel. (ECF No. 33 at 51–56). Petitioner thus cannot prevail on his claims of ineffective assistance of standby counsel. Because this Court denies all of Petitioner's claims, Petitioner's request for an evidentiary hearing on those claims, (ECF No. 34), is also denied. Furthermore, in the course of the Court's review of this matter, Petitioner filed a second motion for partial summary judgment. (ECF No. 36). Petitioner's motion for summary judgment is also denied as moot, given the Court's denial of the petition.

### III. CERTIFICATE OF APPEALABILITY

This Court must lastly determine whether to issue a certificate of appealability. L. App. R. 22.2. Pursuant to 28 U.S.C. §2253(c), a petitioner may not appeal from a final order in a habeas proceeding where that petitioner's detention arises out of a state court proceeding unless he has "made a substantial showing of the denial of a constitutional right." "A petitioner satisfies this

standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). As discussed above, there is little, if any, room for reasonable disagreement that Petitioner's claims should be denied. Petitioner is therefore denied a certificate of appealability.

## IV. CONCLUSION

For the reasons set forth above, Petitioner's habeas petition is DENIED, Petitioner's request for an evidentiary hearing, (ECF No. 34) is DENIED, Petitioner's second partial motion for summary judgment, (ECF No. 36), is DENIED as moot, and Petitioner is DENIED a certificate of appealability. An appropriate Order follows.

JOSE L. LINARES,
Chief Judge, United States District Court